### WILLIAM SHAKESPEARE, JR., CO. v. ENTERPRISE MFG. CO.

(District Court, N. D. Ohio, E. D. June 2, 1913.)

No. 22.

1. PATENTS (§ 283*)—SUIT FOR INFRINGEMENT—DEFENSES.
   One who has copied the very device of a patent cannot deny its utility when sued for infringement.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 448–450, 452; Dec. Dig. § 283.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—FISH BAIT OR LURE.
   The Rhodes patent, No. 777,488, for a fish bait or lure, discloses patentable novelty, and is valid. Also, *held* infringed by a device made by defendant, copied from that commercially made and sold by complainant, which, although an improvement on that shown in the drawings of the patent, embodied the patented combination, with equivalent elements, though some were changed in form.

In Equity. Suit by the William Shakespeare, Jr., Company against the Enterprise Manufacturing Company. On final hearing. Decree for complainant.

Chappell & Earl, of Kalamazoo, Mich., for plaintiff.
Fay & Oberlin, of Cleveland, Ohio, for defendant.

DAY, District Judge. William Shakespeare, Jr., Company, which is engaged in Kalamazoo, Mich., in the manufacture and sale of fishing tackle, instituted the present suit against the Enterprise Manufacturing Company, which is engaged at Akron, Ohio, in the manufacture of fishing tackle, charging infringement of United States letters patent No. 777,488, for a fish bait or lure, issued December 13, 1904, to Fred D. Rhodes, and transferred by mesne assignments to the complainant

company; the bill containing the usual prayer for an injunction and accounting.

The improvements claimed are described in the patent in suit as follows:

"Referring to the drawings, the body portion A of my improved bait or lure is preferably shaped like a minnow, and may be suitably painted or decorated as desired. Arranged longitudinally through the body portion A, which is secured thereto, is a rod A, the front end of the rod, B, is formed into a loop for convenience in attaching the line. The tail or trailing hook, F, is secured to the rear end of the rod B. Transverse openings A' are formed through the body, one for each pair of hooks which it is desired the body shall carry. These openings are provided with suitable metal socket-rings as clearly appears in figure 2. A split-ring (a) is provided for each pair of hooks, by this means the hooks are detachably secured in position and may be readily changed as desired or, in case one should become broken, may be readily renewed. The shanks of the hooks rest on the edges of the holes or sockets so that the points of the hooks are supported out from the body in position to receive the strike of the fish. They are also supported so that the body of the minnow is not abraded, by the friction of the hook point against the same."

The claims insisted upon, namely, claims 8, 9, and 10, are:

"8. In a bait or lure, the combination of a body having a transverse opening therethrough; a rod arranged transversely through said opening; a split-ring on said rod arranged in said opening; and a pair of oppositely arranged hooks on said ring, for the purpose specified.

"9. In a bait or lure, the combination of a body having a transverse opening therethrough; a rod arranged transversely through said opening; and a hook secured thereto.

"10. In a bait or lure, the combination of a body having a transverse opening therethrough; a rod arranged transversely through said opening; a split-ring on said rod arranged in said opening; and a suitable hook on said ring, for the purpose specified."

The wooden minnows manufactured by the defendant and complainant compose a wooden minnow having a body with a transverse opening therethrough, a rod extending longitudinally of the body and transversely through the opening, hooks, and a split-link on the rod for attaching the hooks.

By this combination the hooks are supported in such a manner so that their shanks engage the body sockets preventing the hooks on opposite sides of the body from becoming tangled, and so that the hooks are presented in a proper manner to receive the strike of the fish.

The connection is flexible, and the hooks are given a ready movement, as well as being supported from the body in such a manner as to afford the greatest opportunity for the hooks to engage a fish. The combination permits of the hooks being readily changed or renewed by unscrewing the longitudinal rod, removing the split link or ring, taking the hook therefrom, and placing another one thereon.

In 1905, Shakespeare purchased the patent in suit, paying for the same with two patents relating to a mechanical frog and a small stock equipment for the manufacture of the bait, the sum of $6,000; and the Shakespeare Company commenced the manufacturing of the present commercial bait of the Shakespeare Company.

The defendant company commenced to manufacture a bait similar to the commercial bait of the Shakespeare Company in 1907 or 1908. The commercial bait differs from the bait as outlined by the draw-

ings in the Rhodes patent, in that in the drawings of the Rhodes patent the longitudinal rod extends entirely through the wooden body and has a bent loop on either end, and the connecting ring is the split-ring of commerce; while, in the commercial product manufactured by both of these contending companies, the longitudinal rod passes only partially through the wooden body with an engaging screw end, and the connecting link is elongated in form with an opening in the center and the two ends so formed as to permit of hooks being readily placed thereon, and readily taken therefrom.

J. B. Rhodes, who was familiar with fishing tackle and fishing devices, modified this form of split-ring or fastening, and made a fastener which was used in all fish bait manufactured thereafter by himself, and by the Shakespeare Company.

The modification consisted of changing the round split ring or link as shown in the patent in suit, into an elongated link such as is in present use. The elongated link has decided advantage over the split-ring in that it can be used in round-bodied baits and it is also readily used in connection with the putting on, or taking off of hooks, while with the split-ring of commerce this was quite difficult.

The split-ring of commerce can readily be changed into the connecting link of the present devices by elongating the same. J. B. Rhodes also used the threaded longitudinal rods to make them more easily removable from the bait than the long rod fastened from end to end which had been contemplated by the patent. It is apparent that the closest competitor and nearest approach to the minnow in suit was one known as the Dowagiac, or Heddon bait. This was a wooden minnow with a depression in the side of the bait which was a brass socket. In the bottom of the socket was a hole, and through this hole was a screw eye, in which the hook was held in the eye, part of the screw eye, and the screw eye screwed into the wooden part of the bait, holding the hood in the socket. The hooks of the Heddon bait or Dowagiac minnow are quite easily detached by screwing them out, and disengaging them, but the hooks under the Rhodes patent are more flexible, and are more practical to a fisherman when it is considered that a fish could not tear off of the hooks of the Rhodes bait with as much readiness as it could from the hooks of the Heddon bait.

Earl Wiest, a former employé of the Shakespeare Company, was employed by the defendant company during the winter seasons of 1906, 1907, and 1908. He was in conference with Mr. Joseph E. Pflueger of the Enterprise Company, and they had before them the Rhodes patent, and the Heddon patent, and the baits manufactured by the owners of these patents, and, as a result of many conferences and experiments, the defendant company placed on the market the alleged infringing device, and advertised this device extensively as a very desirable, and most improved product in the fishing tackle line. Later on the Enterprise Company applied for a patent and received a patent on the very device manufactured by both companies.

This must necessarily have been done with a knowledge on behalf of the officials of the Enterprise Company that in the prior art and in

extensive use was the very device upon which the company applied for and received a patent.

Known to the prior art were many various wooden minnows, baits, and lures; among them being the so-called "Troy minnow," "muscal-longe minnow," "the floating meadow frog," "Trory minnow," No. 2 "the yellow jacket," "Pflueger minnow," either manufactured by the Enterprise Manufacturing Company or the Pfluegers.

None of these various baits or lures have the transverse hole, the longitudinal rod disposed transversely through the hole and through a split attaching ring or link whereby the hooks are attached and supported.

[1] In any event, it does not appear that any of these prior art devices were successful as was the device in controversy. It is contended by the defendant that the patent is of no utility. Inasmuch as the defendant company is employing the very device made by the complainant company, it is in no position to deny the utility of such a device. Gandy et al. v. Main Belting Co. et al., 143 U. S. 587, 12 Sup. Ct. 598, 36 L. Ed. 272; Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939; Hancock Inspirator Co. v. Jenks (C. C.) 21 Fed. 911; Niles Tool Works v. Betts Machine Co. (C. C.) 27 Fed. 301.

A number of prior patents were introduced in proof. However, it appears that, with the exception of the Heddon patent, none of the patents contained a structure that was successful commercially.

In the Heddon patent in order to turn the hooks around to disengage them you would have to screw and unscrew the eye that held the hook in place. This caused the hooks to be rigid, and would not engage and hold a fish in the same successful manner as a flexible hook or hooks. All of the patents of the prior art were considered by the Pfluegers when they were attempting to devise a bait to compete with the Rhodes and Heddon baits, and nothing from these patents would suggest the device employed in the patent in suit.

[2] If the defendant's structure is a mere modification or change in form from the structure of the patent in suit, and an exact duplicate of complainant's structure, as manufactured for the market, there is little to be said on the question of infringement.

There is no question but that the two commercial structures of the complainant and defendant are identical.

The round split ring or link of the patent is changed into an elongated split ring or link to accommodate the different form of bait body and also to afford a more ready manner of engaging and disengaging the hooks. A split-link is used, and this split-link possesses utility over the exact structure shown in the patent.

But the patent involves the idea of the combination of the transverse holes, the split-ring, and the longitudinal rod, and, although this split-link is an improvement over the split-ring of the patent, this does not necessarily alter or avoid infringement. Risdon Iron & Locomotive Works v. Trent (C. C.) 92 Fed. 389.

The essential ideas of the combination present in the Rhodes patent are present in the manufactured minnows of the defendant company.

It has been held that a patentee was protected against an improver

as well as the general public. Columbia Wire Co. v. Kokomo Steel & Wire Co., 143 Fed. 116, 74 C. C. A. 310.

If any improvements were made over the original patent, they were made not by the defendant, but by the predecessor in title to the complainant company.

I am of the opinion that the complainant is entitled to a full range of equivalents.

The patent described a split-ring, and showed a split-ring in the form in which rings are commonly commercially known. But the novelty evidenced by the patent was not the use of a split-ring of a particular form, it was not of the essence of the invention, nor was the particular form of the longitudinal rod disposed through this split-ring of the essence of the invention; but Rhodes did produce a combination of elements which was entirely new and which proved to possess great merit.

If the rod with the screwed end and the split elongated link are equivalent to the long longitudinal rod of the original patent, and the split-ring of that patent, then, the same combination being employed, the patent is valid, and the defendant's device would infringe.

I am of the opinion that these elements are equivalents, for, as said by Walker on Patents, § 354:

"An equivalent is a thing which performs the same function, and performs that function in substantially the same manner as the thing of which it is alleged to be an equivalent."

I am of the opinion that the invention of the patent showed a decided advance in the art of manufacturing fishing baits or wooden minnows, and that the defendant has very plainly infringed this patent.

A decree may be entered finding infringement, and awarding costs, and ordering an injunction and accounting.